**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Raymond J. LYONS,**
**Defendant-Appellant.**

**No. 81–1287.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1981.

Decided Feb. 1, 1982.

Certiorari Denied June 21, 1982.
See 102 S.Ct. 2965.

Richard F. Walsh, Chicago, Ill., for defendant-appellant.

Nancy C. Garrison, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and DUMBAULD *, Senior District Judge.

DUMBAULD, Senior District Judge.

Appellant, five other individuals, one corporation and a union chose to stand trial for violation of the Sherman Act (15 U.S.C. 1) by bid-rigging in the sheet metal trade on construction projects of the State of Illinois, Cook County, and the Chicago Board of Education. Twelve additional counts charged mail fraud violations (18 U.S.C. 1341) in connection with transmittal of bond forms and purchase orders to the successful bidders. Twenty-two other defendants entered pleas. The union was dis-

missed at the close of the government's case. Four defendants were acquitted. Two were convicted on nine and seven counts respectively. Appellant was convicted on all thirteen counts.

Appellant urges upon us four points, contending that: (1) one comprehensive conspiracy was charged but several smaller conspiracies were proved; (2) the charge did not properly state the law on multiple conspiracies; (3) there was not sufficient proof of use of the mails; and (4) that evidence should have been suppressed which was derived from use of appellant's voluntary statements during negotiations for immunity.

■ As to the first point, it is elementary that a defendant can be convicted only of the offenses with which he is charged in the indictment, and not with some other offense established by the evidence at trial. *Stirone v. U.S.*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

■ But the trial judge explicitly charged that "you may judge the defendants only on the charges alleged in the indictment. You may not convict them of any other alleged conspiracy or scheme in the event you should conclude that they have engaged in some other conspiracy or scheme. And so if you are not convinced beyond a reasonable doubt that a particular defendant knowingly and intentionally joined the conspiracy or scheme alleged in the indictment, you must find that defendant not guilty." (Tr. 2840)

The evidence established a long-continued practice of bid-rigging on public projects. The fact that different contractors were interested in different projects, and did not all participate in bidding on all three categories (State, county and school) of projects involved, does not detract from the unity of the underlying arrangement and agreement.

---

* The Honorable Edward Dumbauld, U.S. Senior District Judge for the Western District of Pennsylvania, sitting by designation.

The basic conspiracy was an "institutional" or "structural" conspiracy. It provided a permanent mechanism for activating smaller groups interested in particular contracts.[1] Such a type of conspiracy was found to be violative of the Sherman Act in a recent case in this Court, *U.S. v. Consolidated Packaging Corp.*, 575 F.2d 117, 128 (7th Cir. 1978). The fact that the secondary or subsidiary conspiracies to rig bids on a particular contract would in and of themselves also amount to violations of the Sherman Act does not immunize participants in the general, comprehensive conspiracy.

■ It was proved that appellant was ring-leader in the anti-competitive machinations. He was a regular participant in the allocation meetings, in all three categories of contracts. He would make telephone calls to those contractors who had obtained copies of the plans and specifications for a particular project and arrange for a meeting, usually at the Como Inn but sometimes at the VACA (Ventilating and Air Conditioning Contractors Association) headquarters. He presided at the meetings.

The allocation procedure took into account the amount of work that had previously been allocated to particular contractors, who had maintained good standing in the conspiracy by attending meetings and submitting bids. The group chose the low bidder and determined the amount of his bid. This was calculated by averaging the cost estimates of interested contractors, then adding a mark-up and an additional amount known as the "burden" which was a cash payment to appellant.[2] The system provided a financial incentive for contractors to refrain from truly competitive bids on a particular job because of the assurance that conformity to the conspiratorial procedure would keep them eligible to benefit from future allocations.

Hence it is clear that there was sufficient evidence to prove appellant's guilt of the charge for which he was indicted (and convicted). His first point lacks merit.

What has already been said demonstrates also that the trial court's charge was adequate and correct.

Following the above-quoted passage of the charge stating that appellant could be convicted only if the jury were satisfied beyond a reasonable doubt of his guilt of the overall conspiracy charged in the indictment, the trial court went on to say that "even if you find that a particular defendant knowingly and intentionally joined a conspiracy or scheme other than those alleged in the indictment, you should, nevertheless, find that defendant guilty of the charge or charges alleged in the indictment if you are convinced beyond a reasonable doubt that the defendant knowingly and intentionally joined the single over-all conspiracy or scheme which is alleged in the indictment." (Tr. 2841).

■ It is clear that this passage reinforces the earlier statement, and emphasizes that appellant must be acquitted unless the jury is satisfied beyond a reasonable doubt of his guilt of *the very offense charged in the indictment,* whatever other wrongful conduct he may have engaged in. Guilt of a collateral offense does not erase guilt of the offense charged in the indictment. Only for the latter was appellant convicted. His second point lacks merit.

■ His third point relates to the mail fraud counts. As held in *U.S. v. Azzarelli,* 612 F.2d 292, 298 (7th Cir. 1979), an antitrust violation may sometimes involve mail fraud, particularly in cases such as the case at bar where the success of the conspiracy requires submission of a false statement denying the existence of any collusion in the bids.

1. By way of illustration, a conspiracy to accept wagers on football games might take the form of an established practice or procedure of doing business, without the need to start *ab initio* and form a new organization to handle the bets on a particular game.

2. It is not clear whether these payments were compensation to appellant for his services in maintaining a profitable system of high and non-competitive bids, or represented the "graft" to be paid to public officials in connection with the projects.

Appellant's contention goes only to the sufficiency of proof of mailing.

The authorities on this point show that uniform office practice is sufficient evidence of use of the mails. *U.S. v. Joyce*, 499 F.2d 9, 15–16 (7th Cir. 1974); *U.S. v. Shavin*, 287 F.2d 647, 652 (7th Cir. 1961).

The testimony suffices to warrant the jury's conclusion that there was no deviation from standard procedure with respect to the transmittals upon which the mail fraud counts were based. Two government witnesses testified that the forms were always mailed. The jury might well believe them, even though a defense witness said they sometimes were picked up at the office before mailing. We reject appellant's third point.

■ The most serious of appellant's contentions is his fourth point, regarding use of evidence against him which was derived as a result of leads obtained from his statements during negotiations for immunity.[3] Any agreement made by the government must be scrupulously performed and kept. *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *U.S. v. Minnesota M.&M. Co.*, 551 F.2d 1106, 1111 (8th Cir. 1977).

■ The doubtful issue is the scope of the government's agreement. It is clear that no promise of immunity was ever made; nor was there any express promise that no derivative testimony would be used against appellant. The trial court held a hearing and heard the testimony of government attorneys and defense attorneys who attended the meetings. It was the recollection of the government lawyers that the chief prosecutor from the Antitrust Division (Arthur Feiveson) made his standard speech regarding "proffer" policy.

This policy requires a proffer from a prospective candidate for immunity indicating what his testimony will contain, so that the government will be able to determine the value of such testimony and whether it is worth obtaining at the price of immunity for the witness.

Feiveson's usual explanation at the outset of a proffer conference was that the conference would be "off the record" in the sense that nothing the appellant said could be attributed to him or used against him, but that the government would be free to follow any leads provided by appellant against him or anyone else involved in the investigation. Appellant's attorneys did not remember any statement that derivative use would be permitted, and in reliance on past practice in the U.S. Attorney's office for the Northern District of Illinois (which was not involved in the investigation then underway) assumed that derivative use was excluded.[4]

In a matter of weight of the evidence and credibility, we should not reject the trial judge's conclusion without stronger proof than appears here. *Prima facie* it seems unlikely that the prosecutor would deviate from his usual "boiler plate." We conclude that Judge Marshall properly disposed of the issue when he said:

When the government seeks to obviate the privilege against self-incrimination, it should do so with greater care than was used here. Ambiguous phrases such as "off the record" should not be used. The terms of conferences in which potentially incriminatory information is given by a person subject to investigation should be spelled out with particular clarity. When the government fails to do this, it is not unreasonable or unfair to hold that it should suffer the consequences of ambiguity.

Nevertheless, we are persuaded in this case by the testimony of counsel for the government, Arthur A. Feiveson, Esq., and William H. Gitlow, Esq., that the terms of the conferences were adequately spelled out and that no violation of the agreement occurred.

---

**3.** Ultimately, the prosecutor declined to seek a grant of immunity for appellant, feeling that he had not been "candid" during the discussions.

**4.** Judge Marshall properly assumed *arguendo* that there had been derivative use, though the government contended that it had alternative sources of information available.

The four issues urged by appellant against his conviction being found wanting in merit, the judgment appealed from is affirmed.

*Affirmed.*